

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 18-01084 |
| FOPCO, INC., | Chapter 7 |
| Debtor. | Dkt. No. 192 |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON OBJECTION TO CLAIM OF NAN, INC.

Dennis C. McElrath objected to the proof of claim filed by Nan, Inc. An evidentiary hearing on the objection was held on November 9-10, 2021. Richard E. Wilson appeared for Nan, Inc., and Jordan S. Blask, Jillian Nolan Snider, Daniel F. Edwards, Sloane B. O'Donnell, and Johnathan C. Bolton

1

appeared for Mr. McElrath.

Based on the evidence, I make the following **FINDINGS OF FACT**:

**A. The MACC**

In 2009, the United States Naval Facilities Division ("NAVFAC") solicited bids from small contractors as part of a $200,000,000.00 Design-Build/Design-Bid-Build HubZone Multiple Award Construction Contract ("MACC"). A MACC is a type of government contract where the government establishes a short list of prequalified contractors who may bid on individual jobs, called task orders.

Contractors certified by the United States Small Business Administration as "HUBZone contractors" were given certain preferences under the MACC. At the time10 both FOPCO and Nan operated as building contractors, FOPCO was certified as a HUBZone contractor, and Nan was not.

**B. The Agreements between FOPCO and Nan**

Before NAVFAC decided which contractors would be prequalified under the MACC, FOPCO and Nan entered into a Teaming Agreement, dated August 3, 2010 (Ex. A-2). The Teaming Agreement provides that, if NAVFAC

2

awarded a prime contract to FOPCO, Nan would "perform [FOPCO's] scope of work under the Prime Contract," "assume all duties, obligations, and responsibilities" of FOPCO under the prime contract and related agreements between FOPCO and NAVFAC, and "obtain, pay for, furnish, and provide all labor, services, materials . . . and other facilities of every kind and description required for the prompt and efficient performance of all of the Work . . . ." Nan also agreed to provide all bonding required by NAVFAC. Thus, the Teaming Agreement shifted to Nan essentially all of FOPCO's obligations under the prime contract with NAVFAC.

After NAVFAC qualified FOPCO to bid for task orders under the MACC, Nan and FOPCO entered into two more agreements. These agreements "further defined" the parties' relationship but did not supersede the Teaming Agreement.

The first such agreement, entitled "Agreement" and referred to as the "Profit and Coefficient Agreement" (Ex. A-1), includes several relevant provisions. (1) The parties agreed to enter into a master subcontract agreement applicable to all awarded task orders. (2) The parties agreed to split any profits

3

on each completed task order, with forty percent payable to FOPCO and sixty percent to Nan. (3) If the parties realized a loss on any task order, the loss would be offset against and recoverable from the profits on any other "open and on-going" task order, but not against profits from any completed task order, and Nan would bear any remaining losses. (4) All estimates and bids submitted to NAVFAC and "all material decisions necessary of execution of each Task Order" would be made by mutual agreement. But if the parties could not agree, Nan had the final say based on Nan's view of what was "in the best interest of the teaming arrangement." (5) Each party was entitled to a "coefficient" to cover overhead and similar costs. FOPCO's coefficient was 1% of each payment and Nan's was 2.5%. (6) FOPCO had the option to "bid, bond, and self-perform" specific task orders, in which case Nan would not share any profits or bear any losses.

The second agreement is entitled "Subcontractor Agreement" and referred to as the "Master Subcontract" (Ex. A-3). The Master Subcontract states that it "shall apply to all Task Orders under the Prime Contract excluding those Task Orders that are bid, bonded and performed by [FOPCO]

4

independently."

The parties intended that all three agreements, taken together, would govern their relationship.

Both parties offered testimony that they did not intend to form a joint venture. But the three agreements created a relationship that was similar to a joint venture in many respects: the parties agreed to work together to develop the bids to NAVFAC and to carry out the work, with Nan having the final say if the parties could not agree; and they agreed on an allocation of profits and losses. The arrangement is also different from the typical prime contractor/subcontractor relationship, because usually the prime contractor controls the subcontractor's work, while the Profit and Coefficient Agreement gave the subcontractor Nan the final say on many important matters.

FOPCO and Nan worked together on thirty-two task orders. (In addition, FOPCO self-performed nine task orders without Nan's involvement.) As to seventeen of those task orders, FOPCO and Nan completed the work, NAVFAC paid what it owed, and FOPCO and Nan resolved the division of the costs and profits. As to the remaining fifteen task

5

orders, the parties have completed the work and NAVFAC has paid FOPCO the full contract price, but Nan and FOPCO never agreed on the division of the proceeds and FOPCO has not paid the full amount that Nan claims.

**C. Change Orders**

Mr. McElrath contends that much of Nan's claim must be disallowed because Nan failed to process formal change orders under the Master Subcontract. The evidence does not bear out this contention.

The Master Subcontract is a standard form contemplating that the subcontractor would propose a firm fixed price for a specified scope of work, and that the price or scope could change only pursuant to a formal change order process. But the Master Subcontract does not specify either the scope of or price for Nan's work. There is a space for a description of the scope of Nan's work. The parties left this blank, presumably because the scope of the job could not be known until a particular task order was awarded, and because the Teaming Agreement required Nan to do all work under the task order. Similarly, the Master Subcontract refers to a "Subcontract Amount" and a "Schedule of Prices," but it does not define or specify either of these items.

6

Mr. McElrath points out that Nan provided estimates to FOPCO that FOPCO used to bid for task orders. He argues that these estimates should be treated as Nan's firm fixed price for the relevant task order under the Master Subcontract. There is no evidence that either FOPCO or Nan intended at the time that the estimates would be treated in that fashion. Further, treating the estimates this way disregards the fact that, under the Profit and Coefficient Agreement, the parties agreed to split the profits on each task order. In a typical prime contractor/subcontractor relationship, the subcontractor's bid to the prime contractor includes the subcontractor's profit but does not account for the prime contractor's profit. However, FOPCO took Nan's estimates and simply included them in its bid to NAVFAC. Nan's estimates must have included a profit for both FOPCO and Nan. Treating Nan's estimates as a firm fixed price under the Master Subcontract disregards the fact that those estimates must have included, not only Nan's profit, but also FOPCO's profit share.

Mr. McElrath's argument is also inconsistent with the fact that, under the Profit and Coefficient Agreement, Nan and FOPCO would make decisions

7

about bids and performance of the work collaboratively, but that, if they could not agree, Nan would have the final say. It would be absurd to require Nan to present formal change orders to FOPCO if Nan could approve those changes over FOPCO's objection.

Finally, Mr. McElrath's argument is inconsistent with his own testimony. When asked, "But for each individual task order, there was never a firm fixed price subcontract with Nan for its performance, correct?", Mr. McElrath answered, "Correct." ECF 317 at 12:22-25. Mr. Lee, the other witness called by Mr. McElrath, agreed. ECF 316 at 20:5-7, 21:18-21.

I find that there was no firm fixed price for Nan's work under any of the task orders and that Nan was not required to submit formal change orders to FOPCO. Rather, the collaborative process outlined in the Profit and Coefficient Agreement applies. FOPCO had personnel on site with whom Nan's staff discussed matters on a regular basis. Nan has proven, by a preponderance of the evidence, that Nan and FOPCO agreed on all material decisions regarding bidding for and performance of each of the open task orders. Even if they had not agreed, the evidence would establish that Nan

8

made those decisions in the best interest of the teaming arrangement between FOPCO and Nan. Nan had a financial incentive to minimize the cost of completing each task order because it was responsible for any losses and entitled to a majority share of any profits on each job. NAVFAC approved all (or substantially all) work done under the task orders and paid the full amount due under the prime contracts.

### D. "Pay if Paid."

The Master Subcontract includes a "pay if paid" provision, meaning that FOPCO as prime contractor was obligated to pay Nan for work as subcontractor only if NAVFAC paid FOPCO for that work under the prime contract. FOPCO argues that Nan did not prove that NAVFAC paid for Nan's work, so the "pay if paid" provision bars Nan's claim. This argument is shocking because Mr. McElrath's own testimony refutes it. When I asked Mr. McElrath, "Did NAVFAC pay everything that NAVFAC was required to pay under these 15 task orders to FOPCO's understanding?", Mr. McElrath answered, "Yes, sir." Therefore, the "pay if paid" provision does not bar Nan's claim.

9

### E. Challenges to Specific Expenses.

Mr. McElrath challenges specific elements of Nan's claim on various grounds. Among other things, he points out that Nan engaged second-tier subcontractors to perform portions of the work under the task orders. In some cases, the amounts payable under the contracts with the second-tier subcontractors exceeded the amount of the estimate for that work that Nan provided for bidding purposes.

After NAVFAC awarded a task order to FOPCO, Nan entered into formal subcontracts with the second-tier subcontractors. In some cases, the amount that Nan ultimately paid a second-tier subcontractor was larger or smaller than the subcontract amount. These differences were the result of informal change order agreements between Nan and the affected second-tier subcontractor to which FOPCO agreed (and even if FOPCO had not agreed, Nan had the final say on such matters). FOPCO did not question any of these differences until after the work under all but two of the task orders had been completed.

FOPCO correctly points out that Nan was obligated to use its unilateral

10

decision-making power "in the best interest of the teaming arrangement" and claims that it could never be in the best interests of the team to pay a second-tier subcontractor more than that subcontractor was entitled to under the relevant subcontract. Nan has adequately explained that many of these payments were attributable to changes in the second-tier subcontractor's scope of work, corrections of mathematical errors, or similar factors, were immaterial, or resulted in overall savings in light of other changes.

Mr. Lee testified that Nan did not produce invoices to substantiate $240,236.47 of its claim. Nan claims that it has produced all of the invoices, but it does not point to these specific invoices in the record, and I have been unable to find them. Therefore, Nan's expenses must be reduced by $240,236.47.

Mr. McElrath raises other challenges to specific expenses claimed by Nan. After careful review, I reject these other challenges. The evidence submitted by Nan is sufficient to establish that Nan is entitled to collect unpaid costs, retentions, and coefficient properly attributable to the fifteen open task orders in the amount of $1,815,630.07, minus $98,024.00 for general excise tax that Nan billed but was not entitled to collect and $240,236.47 of

11

unsubstantiated amounts, leaving a net amount of $1,477,369.60.

**F. Profit Share.**

Nan also claims that FOPCO owes it $1,430,349.42 for Nan's sixty percent share of the profits on the fifteen open task orders. Nan says that this figure is less certain than its cost figures because it depends in part on the costs that FOPCO incurred on those task orders and FOPCO has not provided complete records of its costs. Because Nan has the burden of proving its claim, FOPCO is entitled to all of the costs it has claimed unless Nan asserts and substantiates a challenge to any of them.

The profits on the fifteen task orders equal total revenues less total proper expenses.

NAVFAC paid $43,735,489.80 on account of the fifteen task orders. (Nan says that there may be additional pending payments of $53,534.47, but Nan failed to prove that NAVFAC actually paid or is obligated to pay those amounts.)

Nan's total costs properly chargeable to the fifteen task orders are $30,543,973.20 of billed costs, plus $144,479.85 of unbilled retentions that

12

FOPCO agreed (in prelitigation negotiations) were owed, minus $98,024.00 for general excise tax that Nan billed but was not entitled to collect and $240,236.47 of unsubstantiated amounts, leaving a balance of $30,350,192.58.

FOPCO claims that its total costs on the fifteen task orders was $11,970,358.87. This amount must be reduced for several reasons.

Nan contends, and Mr. McElrath does not deny, that (1) this amount includes $502,712.33 of general excise tax that Nan previously charged to the projects, (2) this amount is not a FOPCO expense, but rather a deduction from Nan's expenses, and (3) Nan has already deducted it from its claim. Therefore, FOPCO's total expenses must be reduced by $502,712.33.

Nan also claims, and Mr. McElrath does not deny, that FOPCO's claimed expenses include equipment charges that are not properly attributed to the open task orders, and that Mr. McElrath agreed in 2017 to reverse these charges. Therefore, FOPCO's total expenses must be reduced by $330,372.54.

Finally, Nan claims that FOPCO increased its claimed expenses by "reclassifying" additional labor charges in the total amount of $527,687.20 and that FOPCO never provided contemporaneous documents showing that these

13

additional labor charges were properly allocated to the open task orders. Mr. McElrath does not specifically challenge this assertion. Therefore, FOPCO's total expenses must be reduced by $527,687.20.

Therefore, FOPCO's total expenses properly attributable to the open task orders is $11,970,358.87 – ($502,712.33 + $330,372.54 + $527,687.20) = $10,609,586.80.

Mr. McElrath testified that FOPCO suffered an aggregate loss on the fifteen task orders; he testified that even if Nan's claim for unpaid expenses were entirely disallowed, the costs that FOPCO incurred on the fifteen task orders exceeded the total amount that NAVFAC paid for those task orders. I give no credit to this testimony. Mr. McElrath offered no corroboration for this claim. The testimony of Nan's witnesses is to the contrary. Even Mr. Lee's testimony does not support it. Mr. McElrath's explanation for his assertion is that FOPCO was entitled to charge its general and administrative ("G&A") expenses to the task orders. This explanation does not hold water. He does not point to any provision of any of the operative agreements that supports his contention. In fact, the Profit and Coefficient Agreement refutes the argument,

14

because it allows each party to collect a specified coefficient for expenses of this kind. Finally, he provides no amount, let alone backup documentation, for the alleged G&A expenses. Moreover, if there were a loss, Nan would be liable for it under the Profit and Coefficient Agreement. If there had been a loss, FOPCO could and would have demanded reimbursement from Nan, but it did not do so. FOPCO's failure to take this obvious step is evidence that there was no loss.

The total profit on the fifteen open task orders is $43,735.489.80 − ($30,350,192.50 + $10,609,586.80) = $2,775,710.42. Nan is entitled to recover sixty percent of this amount, or $1,665,426.25.

Based on these findings of fact, I draw the following CONCLUSIONS OF LAW:

The bankruptcy court has personal jurisdiction over the parties and jurisdiction over the subject matter.[1] Venue is proper in this district.[2] This is a core proceeding in which the bankruptcy court may enter a final judgment.

---

[1] *See* 28 U.S.C. §§ 157, 1334.

[2] *See id.* §§ 1408-1409.

15

Nan filed a timely proof of claim. Therefore, Nan's claim is deemed allowed unless a party objects.[3] A properly filed proof of claim is also "prima facie evidence as to the validity and the amount of the claim."[4]

Mr. McElrath has objected to Nan's claim.[5] Therefore, the court must "determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount . . . ."[6]

A claim is allowed to the extent that it is enforceable under applicable nonbankruptcy law (unless one of the special exceptions to allowance applies, and none of those exceptions applies to Nan's claim).[7]

As the objecting party, Mr. McElrath bears the initial burden of coming forward with sufficient facts that carry probative force at least equal to the

---

[3] 11 U.S.C. § 502(a).

[4] Fed. R. Bankr. P. 3001(f).

[5] Fed. R. Bankr. P. 3007.

[6] 11 U.S.C. § 502(b).

[7] *Travelers Cas. & Sur. Co. of Am. v. PG & E*, 549 U.S. 443, 449 (2007).

16

allegations contained in the proof of claim.[8] If Mr. McElrath provides "sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant [Nan] to prove the validity of the claim by the preponderance of the evidence."[9]

The preponderance of the evidence standard requires the proponent of a factual assertion to establish that it is more likely than not that the assertion is true. *In re Arnold and Baker Farms*, 177 B.R. 648, 654 (9th Cir. B.A.P. 1994).

Parties can create a single commercial relationship by entering into multiple contracts. *Marsch v. Williams*, 23 Cal.App.4th 250, 256 (describing that a single commercial relationship can be created in multiple contracts when they are closely connected in purpose, incorporate one another's terms, were executed at the same time, and the breach of one necessarily leads to the breach of the other). When the parties have created such a relationship and have entered into two contracts where one integrates the other, the terms of

---

[8] *Lundell v. Anchor Const. Specialist, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000), citing *Wright v. Holm* (*In re Holm*), 931 F.2d 620, 623 (9th Cir. 1991).

[9] *Id.*, citing *In re Consol. Pioneer Mortg.*, 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3rd Cir. 1992)).

17

those contracts must be construed as a whole. *Pioneer Take Out Corp. v. Bhavsar*, 209 Cal.App.3d at 1355 (holding that where the parties have entered into two contracts and one integrates the other, an arbitration clause included in only one document requires arbitration for disputes arising under either).

Construing the three agreements together, Nan's failure to process change orders does not bar it from collecting the costs referred to in the findings of fact.

Additionally, it would be inequitable to reduce Nan's claim due to the lack of change orders. The evidence demonstrates that FOPCO did not insist on change orders with respect to the closed task orders. The equitable principles of estoppel prevent FOPCO from using the lack of change orders as a basis to refuse payment of Nan's expenses on the open task orders, years after the work on those task orders was finished. *See L.K. Comstock & Co., Inc. v. United Engineers & Constructors, Inc.*, 880 F.2d 219, 226 (9th Cir. 1989). Even if the contracts required the change orders for which Mr. McElrath argues (and they do not), the parties' conduct shows that they mutually waived the requirement.

18

**IT IS HEREBY ORDERED** that Nan holds an allowed unsecured claim against FOPCO in the amount of $1,477,369.60 + $1,665,426.25 = $3,142,795.85.

**END OF FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND ORDER**